NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0496n.06

No. 14-1853

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 10, 2015
DEBORAH S. HUNT, Clerk

DAGS II, LLC and G2BK, LLC,                    )
                                               )
    **Plaintiffs-Appellants,**          )        ON APPEAL FROM THE
                                               )        UNITED STATES DISTRICT
v.                                             )        COURT FOR THE WESTERN
                                               )        DISTRICT OF MICHIGAN
HUNTINGTON NATIONAL BANK and                   )
FOURTEEN CORP.,                                )        **OPINION**
                                               )
    **Defendants-Appellees.**          )
                                               )

BEFORE:  COLE, Chief Judge; MOORE and CLAY, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge**.  Plaintiffs DAGS II, LLC and G2BK, LLC brought this action against Defendants Huntington National Bank and its wholly-owned subsidiary Fourteen Corp. seeking a declaratory judgment ordering that DAGS is not indebted to the Defendants following a 2011 assignment of a mortgage and certain debt and the subsequent foreclosure sale of the underlying property.  The Plaintiffs also seek tort and statutory damages for actions Huntington took against personal property that secured the debt at issue.  The district court granted partial summary judgment to the Defendants, and the parties entered a stipulation resolving the remaining issues, pending appeal.  On appeal, the Plaintiffs argue that the district court improperly found that they lacked standing to challenge the terms of the 2011 assignment; that Huntington and Fourteen are a single corporate entity and thus the foreclosure sale discharged debt relating to a mortgage signed in 2004; and that questions of fact remain

regarding the fair market value of the property at the time of the foreclosure sale. For the following reasons, we **VACATE** the district court's grant of summary judgment and **REMAND** the case to the district court.

## I. FACTS AND PROCEDURE

### A. Factual Background

In 2004, Baker Lofts, LLC acquired an abandoned building in Holland, Michigan, for the purpose of renovating it into a mixed-use, residential and commercial development. Defendant Huntington Bank provided Baker Lofts capital for the development. As security for an existing $800,000 promissory note and for any future indebtedness to Huntington, Baker Lofts granted Huntington a mortgage on the real property underlying its proposed development (the "2004 Mortgage"). R. 29-2 (2004 Mortgage) (Page ID #428). In 2005, Baker Lofts granted Huntington a second mortgage on the same property as security for a $5,000,000 promissory note, the $800,000 promissory note subject to the 2004 Mortgage, and any future indebtedness to Huntington (the "2005 Mortgage"). R. 29-3 (2005 Mortgage) (Page ID #450). Baker Lofts further granted Huntington a security interest in personal property, including its liquor license and its right to tax-increment financing ("TIF") reimbursement payments from the City of Holland. *See* R. 29-4 (TIF Security Agreement) (Page ID #469); R. 29-5 (Personal Property Security Agreement) (Page ID #478). On December 14, 2007, Baker Lofts obtained a $2,675,000 loan from Huntington, R. 26-2 (2007 Note) (Page ID # 291), and, on November 26, 2008, Baker Lofts obtained a $2,457,364 loan from Huntington, R. 26-3 (2008 Note) (Page ID #299).

Baker Lofts defaulted on its loans in early 2011. In May 2011, Huntington assigned to Defendant Fourteen Corp. "all right, title and interest . . . in, to and under that certain [2005] Mortgage and debt due thereunder." R. 30-1 (2011 Assignment) (Page ID #491). Fourteen is a Huntington wholly-owned subsidiary that is primarily dedicated to holding "real estate that was pledged to secure mortgage loans by Huntington." *See* R. 72-1 (Defs. Resp. to 2nd Disc. Req. at 5) (Page ID #1252). About a month after the assignment, Fourteen published a notice of intent to foreclose on the 2005 mortgage. R. 30-2 (Foreclosure Notice at 2) (Page ID #496). The Foreclosure Notice stated that "[t]he balance owing on the Mortgage is $5,254,435.04." *Id*. at 3 (Page ID #497). Consistent with this notice, on July 21, 2011, Fourteen prepared a bid sheet indicating that it was going to bid $5,254,435.04 for the property at a sheriff's foreclosure sale. R. 30-3 (Bid Sheet at 4) (Page ID #502).

A week later, Fourteen prepared a revised bid sheet, this time with a bid amount of $1,856,250. R. 30-4 (Bid Sheet at 4) (Page ID #506). The Defendants claim that Fourteen revised its bid amount based on a May 2, 2011 update of a November 15, 2010 appraisal of the property, which concluded that there was a $2.2 million "Retrospective 'As Is' Restricted Market Period Values" for the property, R. 70-14 (Appraisal Update) (Page ID #1204–05), less two condominium units, which were no longer owned by Baker Lofts. R. 70-15 (Wilk Dep. at 56–57) (Page ID #1216–17); R. 36-5 (Bid Worksheet) (Page ID #700). On July 28, 2011, Fourteen purchased the Baker Lofts property through the sheriff's sale with a credit bid of $1,856,250. R. 76-6 (Sheriff's Deed) (Page ID #1758–59). No one else bid on the property. Three potential buyers, Daniel Dykgraaf, Jeffrey Padnos, and Jon Rooks, submitted affidavits indicating that

they were prepared to bid on the Baker Lofts property in July 2011, but did not because they would have purchased the property subject to the senior-2004 Mortgage, which was still held by Huntington. *See* R. 72-14 (Dykgraaf Aff.) (Page ID #1647); R. 72-15 (Padnos Aff.) (Page ID #1650); R. 72-16 (Rooks Aff.) (Page ID #1654). Specifically, Dykgraaf and Padnos attested that they were prepared to bid $5.3 million and $5.5 million, respectively. R. 72-14 (Dykgraaf Aff. at 3) (Page ID #1647); R. 72-15 (Padnos Aff. at 2) (Page ID #1650). According to Huntington, following the sheriff's sale Baker Lofts owed Huntington roughly $3,330,000. R. 70-8 (Commercial OREO Form) (Page ID #1156).

Baker Lofts filed for bankruptcy in January 2012. Before doing so, Baker Lofts transferred its liquor license to Plaintiff G2BK. R. 12-7 (Liquor License Certification) (Page ID #188). Huntington then obtained from G2BK a security interest in the liquor license on the grounds that the license was covered by the Personal Property Security Agreement before Baker Lofts transferred it to G2BK. R. 30-5 (Assignment of Liquor License) (Page ID #508). Huntington also provided notice of its intent to exercise its security interest in the TIF rights and to sell them at public auction on April 10, 2012. R. 2-4 (TIF Notice) (Page ID #91). In the notice, Huntington recited Baker Lofts' then-outstanding indebtedness as totaling $3,437,757.73. *Id.* Huntington purchased the TIF rights with a credit bid of $1,107,000. R. 76-18 (Bill of Sale) (Page ID #1887).

In February 2012, Huntington offered to release its 2004 Mortgage on the property if Baker Lofts (or its designee) redeemed the property at the redemption price. R. 76-14 (2/22/12 Email) (Page ID #1860); R. 76-23 (Wilk Decl. at 3) (Page ID #1922). Huntington received three

offers for the property. *See* R. 70-6 (New Co., LLC Offer) (Page ID #1146); R. 70-7 (SpaceSource Offer) (Page ID #1154); R. 76-13 (Padnos Offer) (Page ID #1858). But none were accepted, and Baker Lofts failed to redeem the property during the redemption period. R. 76-8 (Schandevel Decl. ¶ 23–24) (Page ID #1824–25). On April 18, 2012, Fourteen sold the Baker Lofts property to G.R. Developments, LLC for $2,355,000. R. 76-15 (Real Estate Purchase Agreement) (Page ID #1863). Two months later, Huntington executed a "Partial Release" of the 2004 Mortgage. R. 72-1 (Defs. Resp. to 2nd Disc. Req. at 4) (Page ID #1251).

Plaintiff DAGS II, LLC purchased Baker Lofts' remaining assets from the bankruptcy estate in April 2013. R. 31-4 (Bill of Sale) (Page ID #521). DAGS and G2BK brought this action shortly thereafter.

**B. Procedural Background**

DAGS and G2BK filed this action seeking: (1) a declaratory judgment that Baker Lofts is not indebted to Huntington because it assigned all of Baker Lofts' indebtedness to Fourteen in 2011 and, therefore, the remaining security agreements are invalid (Count I); (2) a declaratory judgment that Fourteen held both the 2004 and 2005 mortgages and, therefore, the indebtedness secured by the 2004 Mortgage was extinguished at the sheriff's sale and the remaining security agreements are invalid (Count II); (3) conversion damages against Huntington for asserting control over the TIF rights and the rents for the Baker Lofts property following Huntington's alleged assignment of Baker Lofts' indebtedness to Fourteen (Counts III and IV); (4) claim and delivery as to Huntington for possessing and controlling the TIF rights (Count V); (5) tortious interference damages against Huntington for allegedly interfering with Baker Lofts' TIF

agreement with the City of Holland (Count VI); and (6) damages for Huntington's alleged violation of Michigan's secured transactions statute when it sold the TIF rights (Count VII). R. 1 (Compl.) (Page ID #1).

The parties filed cross motions for summary judgment. The heart of the Plaintiffs' argument was that any remaining indebtedness owed to Huntington was extinguished upon foreclosure of the junior-2005 Mortgage. In support, the Plaintiffs cited *Board of Trustees of General Retirement System of City of Detroit v. Ren-Cen Indoor Tennis & Racquet Club*, 377 N.W.2d 432 (Mich. Ct. App. 1985), which held that when a plaintiff that held junior and senior mortgages foreclosed on the junior mortgage, the two mortgages merged as a matter of law and the debt due under the senior mortgage was extinguished. The Plaintiffs argued that following the 2011 assignment from Huntington to Fourteen, Fourteen held both the senior-2004 Mortgage and the junior-2005 Mortgage, and when Fourteen foreclosed on the junior mortgage, all debt secured by the senior mortgage was extinguished pursuant to the "equitable merger doctrine" set forth in *Ren-Cen*. To support this, the Plaintiffs pointed to the Defendants' answer, which admitted that Huntington assigned both the 2004 and 2005 mortgages to Fourteen. They also pointed to the terms of the 2011 assignment, which, according to Plaintiffs, indicated that Huntington assigned to Fourteen all of Baker Lofts' debt. Conversely, the Defendants asserted that Huntington did not assign all of Baker Lofts' indebtedness to Fourteen—that Huntington's admission to the contrary was a mistake—and that the Plaintiffs lacked standing to challenge the meaning of the 2011 assignment.

6

The district court agreed with the Defendants. The court found that the Defendants' admission in its answer was not binding, but instead was clearly a mistake, and thus granted the Defendants leave to amend their answer. R. 50 (D. Ct. Am. Op. at 10) (Page ID #934). The district court also rejected the Plaintiffs' argument that the 2011 assignment transferred all of Baker Lofts' debt to Fourteen on the ground that the Plaintiffs did not have standing to challenge the terms of the assignment because neither is a party, nor a third-party beneficiary, to the assignment. *Id*. at 11–12 (Page ID #935–36). The court then granted the Plaintiffs summary judgment on Count II with respect to Fourteen, because the 2005 Mortgage was foreclosed by the July 2011 sheriff's sale, and granted the Defendants summary judgment on Count I and Count II as it relates to the security agreements because the Plaintiffs had not presented evidence showing that they were no longer indebted to Huntington. *Id*. at 13 (Page ID #937). The district court reserved judgment on the remaining counts.

In response to the district court's opinion, the Plaintiffs asked for and received leave to amend their complaint to allege that Fourteen is a mere instrumentality of Huntington under a pierce-the-corporate-veil theory, and, as a result, Huntington essentially assigned the 2005 Mortgage to itself through the 2011 assignment. R. 56 (1st Am. Compl.) (Page ID #1000). Based on this, the Plaintiffs alleged that the July 2011 sheriff's sale extinguished all debt to Huntington.

Following another round of cross motions for summary judgment, the district court again sided with the Defendants. The district court found that Fourteen was not a mere instrumentality of Huntington and that the Plaintiffs failed to offer evidence that Huntington used Fourteen to

7

commit a fraud or wrong, essential to piercing Huntington's corporate veil. R. 81 (D. Ct. Op. at 9–10) (Page ID #2303–04). Thus, because the Plaintiffs did not show that Huntington and Fourteen were the same entity, the 2004 and 2005 Mortgages were not held by the same party, and the equitable merger doctrine in *Ren-Cen* did not apply. *Id*. at 10 (Page ID #2304). Although the court did find there was a genuine issue of fact as to the value of the property at the time of foreclosure, the court did not resolve the factual dispute, presumably, because it found that Huntington and Fourteen were separate corporate entities. *See id*.

The district court did grant the Plaintiffs some equitable relief, however. The court found that Huntington assigned to Fourteen the 2005 Mortgage and $1,856,250 of Baker Lofts' debt—the price for which Fourteen later purchased the property at the sheriff's sale—and Huntington retained the 2004 Mortgage and the remainder of the debt. *Id*. at 11 (Page ID #2305). This left approximately $3,000,000 in remaining Baker Lofts' debt owed to Huntington, with no debt owed to Fourteen. *Id*. Fourteen then sold the foreclosed property for $2,355,000, and the proceeds were paid to Huntington as a dividend. Thus, the court reasoned, if Huntington is able to collect the full $3,000,000 in outstanding debt, it will have recovered the difference between $2,355,000 and $1,856,250—or $498,750—as excess. Thus, invoking its equitable powers, the district court declared that $498,750 of the debt owed by Baker Lofts to Huntington was discharged, less Defendants' expenses in disposing of the property.

Shortly thereafter, the parties entered into a stipulation to resolve the issues not addressed by the court's summary judgment orders. R. 86 (Stip. and Prop. Or. of Final J.) (Page ID #2323). In the stipulation, the parties agreed that the costs associated with the disposition of the

Baker Property totaled $113,641.73, and, thus, Huntington would discharge $385,108.27 of Baker Lofts' current outstanding indebtedness to Huntington. *Id*. at 2 (Page ID #2324). The parties further agreed that Huntington would be awarded the liquor license, with any credit for the value of the liquor license applied to Baker Lofts' indebtedness. *Id*. Huntington abandoned its claim for possession of any remaining personal property that it previously sought. *Id*. The parties then stated that they stipulated to these facts for purposes of entering a final appealable judgment and none of the stipulations served as waiver of any argument on appeal. *Id*. at 2–3 (Page ID #2324–25). Based on these stipulations, the district court entered final judgment consistent with the stipulations and its summary judgment orders. *Id*. at 4–5 (Page ID #2326–27).

## II. STANDARD OF REVIEW

The court reviews a district court's order granting summary judgment de novo. *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 868 (6th Cir. 2007). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether summary judgment was proper, the court must "review the evidence and draw all inferences in the light most favorable to the nonmoving party." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012). Sitting in diversity, we apply the State of Michigan's substantive law and federal procedural law. *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014).

### III. ANALYSIS

The Plaintiffs raise two main issues on appeal. First, they argue that when Huntington assigned the 2005 Mortgage to Fourteen in 2011, it assigned all of Baker Lofts' debt and, consequently, Huntington retained no interest in the debt at issue and all actions taken against Baker Lofts' property after the assignment were improper. The Plaintiffs claim that the district court erred by finding that it could not address this argument on the ground that the Plaintiffs do not have standing to raise the claim. Second, the Plaintiffs argue that Huntington and Fourteen should be treated as a single corporate entity under a piercing-the-corporate-veil theory. Because the Defendants constitute a single corporate entity holding two mortgages on the same property, the Plaintiffs claim that Michigan's "equitable merger" doctrine set forth in *Ren-Cen* prevents the Defendants from manipulating the foreclosure process to acquire the property below the property's fair market value. The Plaintiffs further argue that the district court erred because it recognized that there was a genuine issue of fact as to the property's fair market value at the time of the foreclosure sale, but nevertheless granted summary judgment to the Defendants rather than resolve this factual dispute at trial. We address these arguments in turn.

### A. The 2011 Assignment

The Plaintiffs first argue that, pursuant to the terms of the 2011 assignment, Huntington assigned to Fourteen all debt that Baker Lofts owed to Huntington. As a result, following the assignment, Baker Lofts' obligations to Huntington were satisfied and the actions Huntington took against Baker Lofts' personal property were improper. The district court found that the Plaintiffs do not have standing to challenge the terms of the 2011 assignment because neither

Plaintiff is a party nor third-party beneficiary to the assignment. R. 50 (D. Ct. Am. Op. at 11–12) (Page ID #935–36).

The cases cited by the district court support the general proposition that a third party may not challenge the validity of an assignment. *See id*. (citing *Woods v. Ayres*, 39 Mich. 345 (1878); *Bowles v. Oakman*, 225 N.W. 613 (Mich. 1929); *Livonia Prop. Holdings, L.L.C. v. 12840–12976 Farmington Rd. Holdings, L.L.C.*, 717 F. Supp. 2d 724, 736 (E.D. Mich. 2010), *aff'd*, 399 F. App'x 97 (6th Cir. 2010)). As the Michigan Supreme Court explained in *Bowles*, "[t]he maker of a promissory note cannot, in an action brought against him by the indorsee or transferee thereof, litigate questions that can properly arise only between the holder and his immediate indorser." *Bowles*, 225 N.W. at 614 (quoting *Gamel v. Hynds*, 125 P. 1115, 1116 (Okla. 1912)); *see also Pashak v. Interstate Highway Const., Inc.*, No. 189886, 1998 WL 2001203, at \*1 (Mich. Ct. App. Mar. 20, 1998) ("Although IHC challenges the validity of the assignment as between [assignor] and [assignees], we find that it lacks standing to do so where the parties to the assignment . . . do not contest its validity.").

This court has recently addressed the bounds of this rule in a series of cases applying Michigan law. In *Livonia*, this court noted that "there is ample authority to support the proposition that a litigant who is not a party to an assignment lacks standing to challenge that assignment." 399 F. App'x at 102 (internal quotation marks omitted). We have since cautioned, however, "that *Livonia's* statement on standing should not be read broadly to preclude all borrowers from challenging the validity of mortgage assignments under Michigan law." *Carmack v. Bank of New York Mellon*, 534 F. App'x 508, 511–12 (6th Cir. 2013). Rather, "[a]n

11

obligor 'may assert as a defense any matter which renders the assignment absolutely invalid or ineffective, or void.'" *Id.* (quoting *Livonia*, 399 F. App'x at 102) (internal quotation marks omitted). "These defenses include nonassignability of the instrument, assignee's lack of title, and a prior revocation of the assignment." *Livonia*, 399 F. App'x at 102. "Obligors have standing to raise these claims because they cannot otherwise protect themselves from having to pay the same debt twice." *Id.* Based on this, a borrower does not lack standing to challenge an assignment "where the borrower has a valid claim that he will face double liability." *Carmack*, 534 F. App'x at 512; *Smith v. Litton Loan Servicing, LP*, 517 F. App'x 395, 398 (6th Cir. 2013) ("[A]s explained in *Livonia*, the purpose of an obligor's defenses [to an assignment to which the obligor is not a party] is to avoid the risk of paying the same debt twice.").

Here, the Plaintiffs do not argue that they risk double liability based on the terms of the 2011 assignment. Instead, the Plaintiffs ask us to hold that Huntington assigned all of Baker Lofts' debts to Fourteen based on the Plaintiffs' interpretation—rather than the interpretation of the actual parties to the assignment—of the assignment's terms. But, absent some claim that the Plaintiffs may be on the hook for double payment, this is precisely what courts do not permit. *See Bowles*, 225 N.W. at 614; *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 254 (6th Cir. 2014) ("A person who is neither a party to the contract nor in privity with the parties, and who is not a third-party beneficiary of the contract, is said to lack 'standing' to enforce the contract's terms and to challenge its validity."); *Smith*, 517 F. App'x at 397 ("Smith was neither a party nor a third-party beneficiary to the Pooling and Service Agreement, so even if its terms were violated, Smith may not challenge compliance with the Pooling and Service Agreement.");

*Livonia*, 399 F. App'x at 102 ("Without a genuine claim that [the assignee] is not the rightful owner of the loan and that [the borrower] *might therefore be subject to double liability on its debt*, [the borrower] cannot credibly claim to have standing to challenge the First Assignment." (emphasis added)). Because the Plaintiffs do not attempt to make that argument here, they have no standing to enforce the terms of the 2011 assignment.

**B.  Piercing the Corporate Veil**

The Plaintiffs next argue that, under the "equitable merger" doctrine set forth in *Board of Trustees of General Retirement System of City of Detroit v. Ren-Cen Indoor Tennis & Racquet Club*, 377 N.W.2d 432 (Mich. Ct. App. 1985), the Baker Lofts' debt secured by the 2004 Mortgage was extinguished when Fourteen acquired the property at the 2011 sheriff's foreclosure because Fourteen is a mere instrumentality of Huntington and the Defendants manipulated the foreclosure process to prevent competitive bidding. Because *Ren-Cen* is central to the Plaintiffs' piercing-the-veil theory of liability, an analysis of this case at the outset is instructive.

In *Ren-Cen*, the plaintiff loaned the defendant $1.1 million and received a promissory note for that amount secured by a first mortgage. 377 N.W.2d at 433. Two years later, the plaintiff loaned the defendant an additional $500,000 and received a promissory note for that amount secured by a second mortgage on the same property. *Id*. When the defendant defaulted on both loans, the plaintiff foreclosed on the second mortgage. *Id*. At the foreclosure sale, the plaintiff bought the property for the amount owed on the second note, despite the undisputed

evidence establishing that the property's fair market value was more than $3 million. *Id*. The

plaintiff then filed suit to recover the amount owed on the first note, and the trial court granted

the plaintiff summary judgment as to that claim. *Id*. The Michigan Court of Appeals reversed.

The court began by noting that where there are two mortgages, "[a] purchaser at a foreclosure

sale of a second mortgage takes the property subject to the first mortgage." *Id*. at 434 (citing

M.C.L. § 600.3236). Thus, "[t]he price at a foreclosure sale on a second mortgage is depressed

to reflect the outstanding first mortgage." *Id*. at 436. This means that "[a] third party who

purchases the property at the foreclosure sale on the second mortgage would have to satisfy the

debt secured by the first mortgage in order to prevent the mortgagee of the first mortgage from

asserting a superior claim to the property." *Id*. But where a party, like the plaintiff in *Ren-Cen*,

holds the first and second mortgage, it need not worry about the mortgagee on the first mortgage

asserting a superior claim. The party can thus "obtain the price advantage of purchasing at a

second mortgage sale without the disadvantage of having to satisfy the debt secured by the first

mortgage in order to obtain uninterrupted enjoyment of the property." *Id*. The court held,

however, that equity does not permit this "double recovery." *Id*. Consequently, the *Ren-Cen*

court held that because the plaintiff held both the first and second mortgage, "the debt secured by

the first mortgage was discharged when plaintiff acquired the mortgaged property at the

foreclosure sale on the second mortgage." *Id*.

In this case, the Plaintiffs argue that Huntington improperly used its wholly owned

subsidiary, Fourteen, to do the very thing that the court in *Ren-Cen* held impermissible. To

succeed, this requires showing that Huntington and Fourteen were operating as a single corporate

entity to wrongfully skirt the *Ren-Cen* holding. The district court dismissed this claim, finding the Plaintiffs failed to offer sufficient evidence showing that Fourteen was a mere instrumentality of Huntington or that Huntington used Fourteen to commit a fraud or wrong. R. 81 (D. Ct. Op. at 9–10) (Page ID #2303–04). We disagree.

Under Michigan law, there exists a presumption that corporate form will be respected. *Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995) (citing *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 761 (Mich. 1947)). "This presumption, often referred to as a 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some other clearly overriding public policy.'" *Id.* (brackets in original) (quoting *Wells v. Firestone*, 364 N.W.2d 670, 674 (Mich. 1984)). Michigan courts will pierce the corporate veil only when (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an injury or unjust loss. *Foodland Distribs. v. Al–Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996); *see also Gledhill v. Fisher & Co.*, 262 N.W. 371, 372 (Mich. 1935). "In the parent-subsidiary context, the protections of the corporate form are premised on the assumption that parent and subsidiary corporations operate as separate entities." *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 799 (6th Cir. 2007). "When a corporation exists as a device to evade legal obligations, the courts, without regard to actual fraud, will disregard the entity theory." *People ex rel. Potter v. Michigan Bell Tel. Co.*, 224 N.W. 438, 440 (Mich. 1929); *Papo v. Aglo Restaurants of San Jose, Inc.*, 386 N.W.2d 177, 185 n.15 (Mich. Ct. App. 1986) (noting that the Michigan Supreme Court has

"acknowledged that the corporate veil can be pierced in the absence of fraud" and upholding a veil-piercing claim based on the breach of a lease). "The propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be intensively fact-driven." *Servo*, 475 F.3d at 798.

Here, reviewing the evidence and drawing all inferences in the Plaintiffs' favor, a genuine issue of fact exists as to whether Huntington's corporate veil should be pierced. First, Fourteen is a mere instrumentality of Huntington. Fourteen, a wholly owned subsidiary of Huntington, shares the same office space and phones as Huntington, and employees working for Fourteen have Huntington email addresses and business cards. R. 72-4 (Schandevel Dep. at 12, 41) (Page ID #1299, 1328); R. 72-1 (Defs. Resp. to 2nd Disc. Req. at 3) (Page ID #1250); R. 72-5 (Hermann Dep. at 23) (Page ID #1370). All of Fourteen's corporate expenses are paid by Huntington. 72-4 (Schandevel Dep. at 33) (Page ID #1320). When Huntington employees work on projects for Fourteen, they do not allocate their time differently or otherwise account for the fact that they were working for Fourteen rather than Huntington. *Id.* at 34 (Page ID #1321); R. 27-1 (Wilk Dep. 9) (Page ID #345). Huntington appoints its officers as officers of Fourteen and Fourteen's officers and employees are paid by Huntington, receiving no compensation from Fourteen. R. 72-1 (Defs. Resp. to 2nd Disc. Req. at 3) (Page ID #1250); 72-4 (Schandevel Dep. at 12) (Page ID #1299). Funds paid to Fourteen are transferred directly to Huntington on a quarterly basis as dividends. 72-4 (Schandevel Dep. at 14, 35) (Page ID #1301, 1322); Appellee Br. at 30.

Furthermore, the actions Huntington took regarding the Baker Lofts' debt and property at issue further indicate that Fourteen is a mere instrumentality of Huntington. Huntington assigned the 2005 Mortgage and Baker Lofts' debt to Fourteen without receiving any monetary compensation in return. R. 72-1 (Defs. Resp. to 2nd Disc. Req. at 4) (Page ID #1251). And, according to the Defendants, Huntington did not assign to Fourteen a specific amount of Baker Lofts' debt through the 2011 assignment. Instead, Huntington assigned some indefinite amount of debt—"anywhere from zero to the total debt due under the loans," R. 27-1 (Wilk Dep. at 12) (Page ID #348)—just enough so that "Fourteen could make its credit bid at the sheriff's sale," Appellee Br. at 37; *see also* R. 27-1 (Wilk Dep. at 10) (Page ID #346). This means that, following the assignment, Huntington and Fourteen were working as a single entity to determine how much Fourteen should bid on the property at the sheriff's sale—and, correspondingly, how much debt Huntington should assign to Fourteen—to help Fourteen purchase the property. Then, when Fourteen sold the Baker Lofts property, the proceeds of that sale were paid directly to Huntington as a dividend. Thus, for all intents and purposes, Fourteen's bid at the sheriff's sale was also Huntington's. Fourteen did not pay Huntington for the capital Fourteen used to credit bid at the 2011 sheriff's sale or for the partial release of the 2004 Mortgage. R. 72-1 (Defs. Resp. to 2nd Disc. Req. at 4) (Page ID #1251). Finally, in correspondence leading up to Fourteen's sale of the property, employees acting on behalf of Huntington treated the Baker Lofts' property as its own rather than Fourteen's. R. 77-2 (Schendevel Email at 3) (Page ID #1950). Taken together, these facts indicate that Fourteen was a mere instrumentality of Huntington. *See Dutton Partners, LLC v. CMS Energy Corp.*, 802 N.W.2d 717, 723 (Mich. Ct.

App. 2010) (finding question of fact existed as to whether subsidiary was instrumentality of parent where internal report identified subsidiary as an asset; companies had same address, phone number, and webpage; entities shared same in-house counsel; subsidiary's letterhead identified it as the parent; and the subsidiary received accounting benefits through relationship); *Papo*, 386 N.W.2d at 185 ("The trial court's conclusion that Aglo-San Jose was a 'mere instrumentality' of Olga is particularly justified in light of Olga's act of taking possession of Aglo-San Jose's assets and treating them as its own without any consideration having been paid to Aglo-San Jose.").

Second, fact questions exist regarding whether Fourteen was used to commit a "fraud or wrong" for the purpose of pierce-the-corporate-veil liability. Again, *prior to* foreclosure, Huntington assigned to Fourteen the 2005 Mortgage and an undetermined amount of Baker Lofts' debt so that Fourteen could credit bid on the property at a later foreclosure sale—at no cost to Fourteen. R. 27-1 (Wilk Dep. at 10) (Page ID #346). Indeed, the very purpose of the assignment was to ensure that Fourteen was able to purchase the encumbered property as soon as Fourteen foreclosed; Huntington wanted its subsidiary to own the property, while retaining the remaining debt and the 2004 Mortgage. *See id.* at 12 (Page ID #348). Sure enough, immediately following the assignment, Fourteen foreclosed on the property, and because Huntington held the senior mortgage, Fourteen was able to bid on the property unchallenged at the sheriff's sale. And the senior mortgage discouraged potential buyers from bidding on the property and allowed Fourteen to purchase the property at a depressed price. *See* R. 72-14 (Dykgraaf Aff. at 3) (Page ID #1647); R. 72-15 (Padnos Aff. at 2) (Page ID #1650); *see also Homeowners Inv. Co. v.*

18

*Kasmikha*, No. 282981, 2009 WL 2382680, at *2 (Mich. Ct. App. Aug. 4, 2009) ("It is presumed that the price at the foreclosure sale on a junior mortgage is depressed to reflect the senior mortgage.") (citing *Ren-Cen*, 377 N.W.2d at 436). Indeed, just a week before the sheriff's sale, Fourteen lowered its bid from $5,254,435.04, R. 30-3 (Bid Sheet at 4) (Page ID #502), to its revised bid of $1,856,250, R. 30-4 (Bid Sheet at 4) (Page ID #506). Although the Defendants argue that Fourteen made this change based on a May 2011 update to a prior appraisal, this makes little sense since Fourteen made its initial $5,254,435.04 bid in July 2011—two months after the appraisal—and only lowered its bid shortly thereafter. Then, following the sheriff's sale, Huntington released the senior mortgage—again, at no cost to Fourteen. Fourteen sold the foreclosed property for a profit and paid the proceeds of the sale to Huntington as a dividend. All the while, Huntington maintained that it owned the remainder of Baker Lofts' indebtedness.

Huntington could not have done this on its own—under *Ren-Cen*, as holder of both the 2004 and 2005 mortgages, it could not have foreclosed on the junior mortgage to depress the price at the foreclosure sale because the two mortgages would have merged into one upon purchase of the mortgaged property. Otherwise, Huntington would have "obtain[ed] the price advantage of purchasing at a second mortgage sale without the disadvantage of having to satisfy the debt secured by the first mortgage," a result the court in *Ren-Cen* held was improper under Michigan law. 377 N.W.2d at 436. So Huntington manipulated the process so that Fourteen could do what Huntington could not. But because equity would not allow Huntington to take these steps, equity should prevent Huntington from using its alter-ago from doing the same. *See Arevelo v. Arevalo*, Nos. 285548, 286742, 2010 WL 1330636, at *16 (Mich. Ct. App. Apr. 6,

2010) ("The remedy of piercing the corporate veil is equitable in nature.") (citing *Foodland*, 559 N.W.2d at 380). Any other result would allow a parent company to "subvert justice" through creative use of its subsidiary. *Seasword*, 537 N.W.2d at 224; *see CMS Energy Corp. v. Attorney Gen.*, 475 N.W.2d 451, 456 (Mich. Ct. App. 1991) (piercing the corporate veil where company misused the corporate form by transferring assets to "avoid regulation of the proceeds to be generated by those assets"); *Servo*, 475 F.3d at 799–800 (breach of contract could "constitute a 'fraud or wrong' for the purpose of veil-piercing liability.").

The Defendants argue that *Ren-Cen* does not apply because, in that case, the creditor would have received a windfall because the property was worth substantially more than the total debt and yet the plaintiff still pursued the deficiency under a separate note; whereas here, the true value of the property was lower than the total remaining debt, so there was no risk of the Defendants receiving a "double recovery." Appellee Br. at 38–41. In support, the Defendants cite *Federal Deposit Insurance Co. v. Torres*, in which the Michigan Court of Appeals held that *Ren-Cen* did not apply because the undisputed market value of the property was significantly less than the total debt. No. 311277, 2014 WL 309787, at *8 (Mich. Ct. App. Jan. 28, 2014). As the *Torres* court noted, in *Ren-Cen*, the plaintiff purchased the property for $500,000 and then sued the defendant for the remaining $1.1 million owed on the debt, despite the undisputed evidence indicating that the property was worth over $3 million. *Id*. at *7. In *Torres*, by contrast, the undisputed evidence indicated that the property at issue was worth $530,000 and the defendant still owed over $1 million on the debt. As a result, in *Torres*, there was no concern that the plaintiff would receive a "double recovery" like in *Ren-Cen*. *Id*. at *8.

Here, unlike *Torres*, questions of fact remain as to whether the fair market value of the property at the time of the foreclosure sale was less than the total remaining debt. Following the sheriff's sale, Baker Lofts owed Huntington roughly $3,330,000. R. 70-8 (Commercial OREO Form) (Page ID #1156). The district court found that the parties submitted "copious amounts of evidence" to support their positions that the value of the property ranged from $1.8 million to $8 million at the time of the sale, and "there is a genuine fact issue as to the value of the property on the date of the foreclosure." R. 81 (D. Ct. Or. at 10) (Page ID #2304). Included among this evidence are affidavits from potential buyers who were prepared to bid $5.3 million and $5.5 for the property but did not because they did not want to purchase subject to the 2004 Mortgage. *See* R. 72-14 (Dykgraaf Aff. at 3) (Page ID #1647); R. 72-15 (Padnos Aff. at 2) (Page ID #1650); *see also* R. 72-16 (Rooks Aff. at 2) (Page ID #1654). In addition, the parties point to various appraisals to support their argument for the real fair market value, each relying on different factors and contingencies. But, as the district court explained, weighing these is not proper at summary judgment. R. 81 (D. Ct. Or. at 10) (Page ID #2304). Thus, a question of fact exists as to whether Huntington used Fourteen to commit a wrong for purposes of piercing the corporate veil.[1] *See Servo*, 475 F.3d at 799–800 ("[W]e hold that, assuming that a jury concluded that SKI could recover for breach of contract, this breach would constitute a 'fraud or wrong' for the purpose of veil-piercing liability.").

---

[1]None of this is to suggest that the district court's equitable decision to credit the profits that Fourteen paid back to Huntington will not eventually be the correct result; only that, given the factual dispute, doing so at summary judgment was improper.

Finally, the parties do not appear to contest that if Fourteen was able to purchase the property below fair market value because of the Defendants' wrongful maneuvering, the Plaintiffs suffered an injury for the purpose of veil-piercing liability based on the Defendants' actions. *See* R. 76 (Defs. Resp. to SJ at 17) (Page ID #1682); Appellant Reply Br. at 18.[2] Accordingly, summary judgment was improper.

## IV.  CONCLUSION

For the foregoing reasons, we **VACATE** the district court's judgment and **REMAND** the case to the district court consistent with this opinion.

---

[2]Though it is not entirely clear, the Plaintiffs appear to suggest in their briefing that they should receive the difference between Fourteen's bid amount and the true value of the property even if *Ren-Cen* does not apply, as an alternative to their piercing-the-corporate-veil theory. But, in support, the Plaintiffs simply note the fact dispute and cite the Defendants' admission that a credit would be appropriate "under the equitable principles of *Ren-Cen*," Appellant Br. at 40–41 (quoting R. 76 (Defs. Resp. to SJ at 17) (Page ID #1682))—the same analysis we address above. The Plaintiffs do not develop any alternative basis for this relief, and thus we do not address this issue further.