RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0166p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DAGS II, LLC; G2BK, LLC,

　　　　　　　　　*Plaintiffs-Appellants,*

　　　*v.*

HUNTINGTON NATIONAL BANK; FOURTEEN
CORPORATION,

　　　　　　　　　*Defendants-Appellees.*

No. 16-2332

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:13-cv-00393—Robert Holmes Bell, District Judge.

Argued: June 22, 2017

Decided and Filed: July 27, 2017

Before: BOGGS, CLAY, and SUTTON, Circuit Judges.

───────────────

#### COUNSEL

**ARGUED:** Dennis W. Bila II, BILA & ASSOCIATES, PLLC, Harbor Springs, Michigan, for Appellant. Jeffrey G. Raphelson, BODMAN PLC, Detroit, Michigan, for Appellees. **ON BRIEF:** Dennis W. Bila II, BILA & ASSOCIATES, PLLC, Harbor Springs, Michigan, for Appellant. Jeffrey G. Raphelson, James J. Walsh, Amanda J. Frank, BODMAN PLC, Detroit, Michigan, for Appellees.

───────────────

#### OPINION

───────────────

SUTTON, Circuit Judge. This case presents a mixed question of law and math. Baker Lofts borrowed money from Huntington National Bank to convert an abandoned furniture

factory into residential and commercial real estate. The venture did not go well. Baker Lofts defaulted on its loan payments. Huntington, through a subsidiary, foreclosed on the building. And the assignee of Baker Lofts' legal claims filed a lawsuit against Huntington to prevent it from collecting Baker Lofts' unpaid debt and to recover the other collateral that Huntington had taken to satisfy the debt. A bench trial distilled all of these events into two questions: Was the building worth more than Baker Lofts' debt when Huntington foreclosed? And, if so, by how much? Because the district court correctly concluded that Baker Lofts' debt exceeded the value of the foreclosed building and because the excess permitted Huntington to take possession of the other property securing its loans, we affirm the judgment in Huntington's favor.

I.

In 2004, Baker Lofts, LLC, purchased the abandoned Baker Furniture Company building in Holland, Michigan, with plans to renovate it into a commercial and residential space. Huntington National Bank provided the financing. Loans of more than $5 million were secured by two mortgages (2004 and 2005) on the Baker Lofts building and by some of its personal property, including a tax-increment-financing agreement (which provided reimbursement payments from the City of Holland once Baker Lofts completed the renovations), rental income from the building, and Baker Lofts' liquor license.

Baker Lofts defaulted on its loans in 2011. Huntington assigned the 2005 mortgage to its subsidiary, Fourteen Corporation, and Fourteen foreclosed through a public auction. Fourteen's Notice of Foreclosure stated that "[t]he balance owing on the Mortgage is $5,254,435.04," but it did not mention the senior 2004 mortgage, which Huntington also had retained. Trial Ex. 23 at 2–3. Fourteen, the only bidder at the sheriff's sale, purchased the property for $1,856,250. Huntington released its interest in the 2004 mortgage, after which Fourteen sold the property to GR Developments, LLC, for $2,355,000.

Having deducted the amount paid at the sheriff's sale from Baker Lofts' overall debt, Huntington thought that the company still owed it about $3.5 million. To satisfy that debt, Huntington invoked its security interests in the remaining collateral. At a public sale, Huntington bought the rights to Baker Lofts' tax-increment-financing agreement for $1,107,000.

It began collecting the rents owed to Baker Lofts. And it asserted its security interest in the liquor license, which Baker Lofts had sold to G2BK before it declared bankruptcy.

DAGS II (the assignee of Baker Lofts' legal claims) and G2BK sued Huntington and Fourteen, seeking a declaratory judgment that the sheriff's sale of the building had extinguished all of Baker Lofts' debt and that Huntington's claims to the remaining debt and collateral were invalid. They also raised conversion and tortious interference damages claims due to Huntington's collection of the tax-increment-financing agreement, the Baker Lofts rents, and the liquor license, a replevin claim to regain control of the financing agreement, and a claim for damages under Michigan's secured transactions statute. All of the claims turned on this allegation: that Huntington had no right to collect from Baker Lofts after foreclosing on its building.

The district court initially granted summary judgment to Huntington and Fourteen because the plaintiffs had failed to establish that the two companies should be treated as a single entity, which precluded the possibility that Fourteen's foreclosure had discharged a debt owed to Huntington. We reversed on appeal because there were genuine disputes of material fact about whether to pierce the corporate veil between Fourteen and Huntington. On remand, the district court held a four-day bench trial and again ruled in Huntington's favor. Even if Huntington and Fourteen were treated as the same entity, the court held, the plaintiffs' claims were meritless because Baker Lofts still owed Huntington $2,257,549.94 after the sale of its building, which in turn entitled Huntington to foreclose on the tax-increment-financing agreement, the liquor license, and the other collateral.

II.

The dispute turns on whether Fourteen's foreclosure extinguished *all* of Baker Lofts' debt to Huntington. Under Michigan law, when a creditor forecloses by advertisement, the borrower's debt is reduced to the extent of the "true value" of the property, even if the actual foreclosure sale price was lower than that. Mich. Comp. Laws § 600.3280. While the statute applies only to single-mortgage foreclosures, Michigan courts have extended the rule to multiple-mortgage foreclosures when the creditor forecloses on the junior mortgage while still

holding the senior mortgage. *See Bd. of Trs. of Gen. Ret. Sys. v. Ren–Cen Indoor Tennis & Racquet Club*, 377 N.W.2d 432, 436 (Mich. Ct. App. 1985); *FDIC v. Torres*, No. 311277, 2014 WL 309787, at *8 (Mich. Ct. App. Jan. 28, 2014) (per curiam); *see also Restatement (Third) of Prop.: Mortgages* § 8.5 reporter's note (Am. Law Inst. 1996) (listing cases from other States that have adopted the rule); *id.* § 8.5 cmt. (c)(2). A little background explains the principle.

The price a property fetches at a foreclosure sale often is lower than the property's fair market value. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537–38 (1994); *Restatement (Third) of Prop.: Mortgages* § 8.3 cmt. (a). Normal "market conditions . . . simply do not obtain in the context of a forced sale." *BFP*, 511 U.S. at 538. The mortgage-holding creditor has a "distinct bidding advantage" over other purchasers because it can "credit bid" without putting up new cash. *Restatement (Third) of Prop.: Mortgages* § 8.3 cmt. (a). "[U]nsophisticated potential bidders [often] have little idea as to the nature of the real estate being sold" because the notice of public sale often appears in "legal newspapers with limited circulation." *Id.* And potential bidders may find it difficult to inspect a property that remains, until the sale, under the control of uncooperative debtors. *Id.* In view of these risks, Michigan prevents unjust windfalls by ensuring that a debtor's deficiency is reduced by the "true value" of the foreclosed property if the creditor continues to pursue the debt after foreclosing. Mich. Comp. Laws § 600.3280.

All of this means that two numbers resolve this case: the amount of the debt and the true value of Baker Lofts' building at the point of sale. If the debt sufficiently exceeded the building's value, Huntington could pursue payment and foreclose on the remaining collateral. If Huntington could foreclose on the remaining collateral, all of the plaintiffs' claims (for declaratory judgment, damages, and replevin) disappear. And if the plaintiffs have no valid claims, any dispute about whether to pierce the corporate veil between Huntington and Fourteen disappears as well, as there is nothing to recover on either side of the veil.

We apply clear error review to the district court's factual findings and fresh review to its conclusions of law. *Max Trucking, LLC v. Liberty Mut. Ins.*, 802 F.3d 793, 803 (6th Cir. 2015). For the reasons that follow, the district court did not clearly err as a matter of fact in finding that

the debt exceeded the value of the building and did not err as a matter of law in holding that the plaintiffs' claims all fail as a result.

*The amount of the debt.*   The debt comes from three notes with these outstanding balances:  Loan 133 ($2,106,311.53), Loan 141 ($2,530,524.87), and Loan 158 ($548,356.66). R. 56 at 4–5.  Those add up to $5,185,193.06.  From that number, the district court subtracted the tax-increment-financing payments that Huntington received and should have credited towards the debt before the sheriff's sale: $572,643.22.  That left an outstanding debt of $4,612,549.84 on the date of sale.

That finding does not add up, say the plaintiffs, because one of the trustees of the trust that controlled Baker Lofts never signed Loans 141 and 158.  But the district court had two good reasons for including those loans nonetheless.  One was that the plaintiffs admitted these debts in their complaint.  The first time they contested the amount of indebtedness was three years into the case—and not until the second day of trial.  The district court denied leave to amend the complaint well into the twelfth hour of the case, noting the  prejudice to the defendants and the lack of any good explanation by the plaintiffs for failing to read the documents before then.  *See Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 873–74 (6th Cir. 1973).  That was not an abuse of discretion.

The other reason was that Huntington in truth *did loan* Baker Lofts the money included in Loans 141 and 158.  In this setting, unjust enrichment and quantum meruit would have precluded a finding that Baker Lofts did not owe the money.  *See Tkachik v. Mandeville*, 790 N.W.2d 260, 266 (Mich. 2010) (unjust enrichment); *Ordon v. Johnson*, 77 N.W.2d 377, 383 (Mich. 1956) (quantum meruit).  All of this adds up to the reality that the district court did not err in fact or in law in finding that the total debt owed on the date of the foreclosure sale was $4,612,549.84.

*The value of the Baker Lofts building.*  The district court found that the "fair sheriff's sale value" of Baker Lofts' building was $2,355,000.  R. 149 at 28.  No clear error mars that determination either.  Fourteen acquired the building at the foreclosure sale for $1,856,250.  But $2,355,000 was the price a third party buyer eventually paid when Fourteen resold the building less than a year later.  Unlike its purchase at the sheriff's sale—in which Fourteen may have

unfairly scared off other bidders with the outstanding debt on the senior mortgage—Fourteen had every incentive to fetch the highest possible price when *it* sold the property. And the $2.3 million valuation aligned, the district court added, with the appraisal of the more credible defendant expert and with the prior, pre-litigation appraisal of the plaintiffs' own expert.

The plaintiffs offer two rejoinders. They first point to the testimony of three real estate investors who valued the property at over $5.5 million, and to the testimony of their expert appraiser who valued the property at $5.1 million. But the district court did not clearly err in rejecting this testimony. Each of the three investors said they based their estimates on financial information given to them by the plaintiffs; they did not independently investigate the revenues and liabilities of the building for themselves. As the district court rightly pointed out, moreover, "[i]t is one thing . . . , in hindsight, [for them to] say that they would have bid $5 million. But it is another thing to make a formal offer in that amount, after . . . conducting all of the necessary due diligence on the property." R. 149 at 27–28. That was reason enough for the district court to reject their estimates.

Nor was it clear error to decline to accept the testimony of the plaintiffs' appraiser, Todd Schaal. In preparation for his duties as an expert witness, Schaal used the "direct capitalization" valuation method to reach a $5.1 million estimate. According to *The Appraisal of Real Estate*, which Schaal and the defendants' expert acknowledge as the authoritative source for appraisal practice, the direct capitalization method "convert[s] an estimate of a single year's income expectancy into an indication of value in one direct step." Trial Ex. PP at 5. But that method has optimal utility with stable property and "may be less useful" when, as Schaal acknowledged is the case here, a property has "income or expenses that are expected to change in an irregular pattern over time." *Id.*

It gets worse. Schaal's appraisal conflicts with his *own* pre-litigation appraisal of the same property, in which he used "discounted cash flow" analysis—an "appropriate tool for valuing any pattern of regular or irregular income," *id.* at 9, and the method used by Huntington's expert appraiser—to arrive at an estimate between $1.8 and $2.2 million. Schaal did not explain the change in methodology to the district court's satisfaction, and has not done so to ours.

That brings us to the plaintiffs' second objection—that the district court erred by determining the "fair sheriff's sale value" rather than the "true value" of the property, per Mich. Comp. Laws § 600.3280, or the "fair market value," per our prior opinion in this case, *DAGS II, LLC v. Huntington Nat'l Bank*, 616 F. App'x 830, 831 (6th Cir. 2015). But that's a distinction without any difference, at least as applied here. "[T]rue value" at a fair sheriff's sale, "fair market value" at a sheriff's sale, and "fair sheriff's sale value" all capture the same, correct idea: the value of the property when the mortgagee and other buyers stand on equal footing at the foreclosure sale. *See Rubin v. Fannie Mae*, 587 F. App'x 273, 276 (6th Cir. 2014); Mich. Comp. Laws § 600.3228. Novel though it may be, the district court's use of its chosen phrase "for lack of a better term," R. 149 at 7 n.3, simply clarifies that the inquiry focuses on preventing double recovery for the mortgagee by determining the price an arm's-length buyer would have paid at the time it foreclosed, *see Ren–Cen*, 377 N.W.2d at 436. The district court's error in nomenclature, if indeed it was one, was not an error in law or logic or math.

Plus, even if Michigan requires the amount of the deficiency to be reduced by the "fair market value" of the property *outside* the context of a forced sale, the record shows that the property's fair market value was likely $2,355,000 (the highest bid when Huntington resold the building with every incentive to fetch the best price) and at most $3,080,000 (the valuation set by Huntington's expert appraiser). Either way, the amount neither exceeds the debt nor reduces it enough to make Huntington's collection of the financing agreement and the liquor license unlawful. The district court did not clearly err in finding that the relevant value of the Baker building was $2,355,000.

The plaintiffs make one last objection. They argue that it doesn't matter whether Huntington's outstanding debt was more or less than the value of the Baker building. Under the "equitable merger" doctrine of *Ren–Cen*, 377 N.W.2d at 435–36, they say, their liabilities under the senior 2004 mortgage were extinguished when Fourteen foreclosed on the 2005 mortgage and purchased the property at the sheriff's sale. But *Ren–Cen* applied this equitable doctrine to prevent a double recovery where the value of the foreclosed property exceeded the amount of debt secured by two mortgages. The court reasoned that, if the creditor could obtain a property worth $3,000,000 by foreclosing the $500,000 junior mortgage and still pursue payment on the

$1,100,000 senior mortgage, the creditor would receive an impermissible windfall. *Id.* at 433, 436. No such windfall occurs, however, when the outstanding debt exceeds the property's value. *See Torres*, 2014 WL 309787, at *8. Quite to the contrary. Application of the doctrine here would result in a windfall for the *debtor*. The equitable principles that gave birth to this doctrine do not extend to this distinct setting.

Having upheld both of the district court's relevant rulings—the amount of the debt and the value of the building—we are left with one last step to this proof. If we subtract the value of the Baker Lofts' building ($2,355,000) from the amount of the debt ($4,612,549.84), that leaves $2,257,549.84, the amount Baker Lofts still owed Huntington after it foreclosed on the building. Three consequences follow from that finding. The foreclosure did not extinguish Baker Lofts' debt. Huntington was entitled to foreclose on the tax-increment-financing agreement (worth $1,107,000) and demand the Baker Loft liquor license (worth less than the remainder). And plaintiffs' claims for damages, replevin, and declaratory judgment arising from lawful collection actions therefore must fail.

For these reasons, we affirm.