RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MAX TRUCKING, LLC, a Michigan limited liability company,

          *Plaintiff-Appellant,*

    *v.*

LIBERTY MUTUAL INSURANCE CORPORATION, a Wisconsin corporation,

          *Defendant-Appellee.*

No. 14-2115

> Appeal from the United States District Court
> for the Western District of Michigan at Grand Rapids.
> No. 1:12-cv-00060—Robert J. Jonker, District Judge.

Argued: June 11, 2015

Decided and Filed: September 21, 2015

Before: KEITH and CLAY, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Christopher M. Gibbons, GIBBONS & BOER, PLC, Grand Rapids, Michigan, for Appellant. Graham K. Crabtree, FRASER, TREBILCOCK, DAVIS & DUNLAP, P.C., Lansing, Michigan, for Appellee. **ON BRIEF:** Christopher M. Gibbons, GIBBONS & BOER, PLC, Grand Rapids, Michigan, for Appellant. Graham K. Crabtree, Michael P. Donnelly, FRASER, TREBILCOCK, DAVIS & DUNLAP, P.C., Lansing, Michigan, for Appellee.

_____

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

_____

## OPINION

_____

MARBLEY, District Judge.  Plaintiff-Appellant and Counter-Defendant, Max Trucking, LLC ("Max Trucking"), appeals the district court's findings of fact and conclusions of law following a bench trial, pursuant to Fed. R. Civ. P. 52.  Plaintiff-Appellant filed this law suit seeking a declaratory judgment stating that it did not owe workers compensation premiums to Defendant-Appellee and Counter-Plaintiff Liberty Mutual Insurance Corporation ("Liberty Mutual") because the truck drivers at issue were employees and not independent contractors under the Michigan Worker's Disability Compensation Act, Mich. Comp. Laws §§ 418.1-418.400 (the "WDCA").  The district court ruled in favor of Defendant, and adopted Defendant's calculation of the outstanding premium owed, totaling $101,592.

We hold the district court properly determined the drivers are employees pursuant to the applicable test under Mich. Comp. Laws 418.161(1)(n), as recently amended by 2011 P.A. 266, and rendered an appropriate award of damages for unpaid premiums.  Accordingly, the district court's judgment in this case is hereby AFFIRMED.

## I. BACKGROUND

Max Trucking transports dry goods and freight by truck throughout the United States. Max Trucking maintains a staff of six dispatchers at its headquarters in Kentwood, Michigan. The dispatchers find jobs on various websites and then contact one of the 76 truck drivers living throughout the United States who haul freight for Max Trucking, and offer the load to that driver. About twenty of these drivers are based in Michigan.

The WDCA requires employers in Michigan to maintain worker's compensation insurance coverage for their employees.  If an employer is unable to obtain worker's compensation insurance through the voluntary market, the employer may purchase worker's compensation insurance through Michigan's involuntary market.  The Michigan Worker's Compensation Placement Facility ("the Facility") administers the

involuntary market in Michigan, pursuant to Chapter 23 of the Insurance Code of 1956, Mich. Comp. Laws § 500.2301, *et seq*.

In 2006, Max Trucking applied for worker's compensation insurance in the involuntary market through the Facility. Liberty Mutual received the request from the Facility and issued a policy to Max Trucking. Liberty Mutual renewed the policy annually for several years. Effective December 5, 2010, Liberty Mutual issued a renewal policy with coverage dates from December 5, 2010 through December 5, 2011 (the "WC 010 Policy"). When the WC 010 Policy expired on December 5, 2011, it was renewed for an additional year (the "WC 021″ Policy").

In March 2011, Liberty Mutual audited Max Trucking and determined that 16–18 Michigan-based drivers who leased trucks from Max Trucking through a lease-to-buy program (hereafter referred to as the "drivers") were employees, not independent contractors, for the purposes of Michigan's worker's compensation laws. Based on this determination, Liberty Mutual increased Max Trucking's policy premium. Max Trucking disputes the propriety of the premium increase and has not paid Liberty Mutual the additional amounts associated with the premium increase. Late in 2011, Liberty Mutual cancelled the WC 021 Policy. Early in 2012, Max Trucking filed this lawsuit seeking a declaratory judgment that states the drivers operating under the lease-to-buy program are not employees of Max Trucking but are independent contractors for purposes of the WDCA. Max Trucking also sought a declaratory judgment stating that Liberty Mutual is not entitled to increased premiums associated with the drivers and that Max Trucking is not obligated to carry worker's compensation insurance for the drivers under the WDCA. Liberty Mutual filed a counterclaim on March 15, 2012, seeking unpaid premiums totaling $101,592, which it claims Max Trucking owes it under the WC 010 and WC 021 policies.

The district court conducted a bench trial on February 4, 2014. As the district court properly noted, the "dispute hinges on whether under Michigan's workers compensation insurance laws the truck drivers at issue are properly categorized as employees or independent contractors." *Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, No. 1:12-CV-60, 2014 WL 3756129, at *1 (W.D. Mich. July 31, 2014).

Max Trucking first presented the testimony of its general manager, Dalibor Kovacevic. Kovacevic testified that Max Trucking has three different types of drivers: those who own their trucks outright; those who are leasing or purchasing their truck from a third-party; and, those who use the lease-to-buy program offered by Max Trucking. Kovacevic explained that when Mario Banozic first purchased the company in 2006, he employed a driver to operate a truck owned by the company, and he purchased worker's compensation insurance for that driver. In April 2006, the driver was in a bad accident, and Banozic incurred a high worker's compensation cost. At that point, Banozic decided only to use owner-operators, and not to hire employee-operators. In 2008, however, many of Banozic's drivers lost their trucks due to the economic downturn, and Banozic's fleet diminished considerably. As a result, in 2010 Max Trucking developed a financing scheme whereby Max Trucking purchased trucks, and offered them to drivers on a lease-to-buy basis.

Kovacevic testified that 16–18 Michigan drivers acquired their trucks through this lease-to-buy program, and he explained the parameters of the program. Under the lease-to-buy program, Max Trucking purchased trucks, and then leased the trucks to drivers with the understanding that at the end of the lease term, the drivers could purchase the tractor-trailers for a single dollar. The drivers paid Max Trucking—in addition to all the expenses incurred on an individual load—a $4,000 down payment, and then a monthly payment for lease of the truck. A written contract governed each of these lease-to-buy arrangements. Max Trucking, therefore, officially held the title to the trucks, and the loan from the bank for each truck was issued to Max Trucking. Under the program, Max Trucking does not refund the down payment or any lease payments if a driver ceases to make lease payments and transport freight using the leased truck. As the district court explained, "the arrangement is essentially a financing vehicle in which a driver acquires a truck on the strength of Max Trucking's credit, and then bears the cost of acquisition through monthly lease payments to Max Trucking." 2014 WL 3756129, at *2. Further "these drivers are effectively economically dependent on Max Trucking for their ability to operate as truckers," because they would not have otherwise had the credit to purchase the trucks. *Id.*

In one instance, a driver sold his leased truck, and Max Trucking received the payment because the registration was in its name; but, Max Trucking then paid the trucker for his equity in the truck. On a separate occasion, a trucker went to work for another trucking company, while still making lease payments to Max Trucking. Further, three of Max Trucking's dispatchers purchased trucks from Max Trucking under the lease-to-buy program and hired drivers to drive the leased trucks for them.

Max Trucking has a written contract with all of its drivers:

> The contracts for the drivers at issue in this case are part of the trial record. The contracts detail terms on which Max Trucking hires drivers to transport commodities on behalf of Max Trucking. The contracts suggest that the individuals contracting with Max Trucking may opt to hire other drivers to perform the services the contracts describe, but in actual practice, the individuals who enter these contracts with Max Trucking are the drivers themselves. The contracts provide that the drivers will use motor vehicles the drivers own or are leasing from Max Trucking to load, transport, and unload commodities that Max Trucking makes available to the drivers for this purpose. The contracts describe the terms of payment from Max Trucking to drivers for transporting commodities, outline costs the drivers will bear, and specify regulatory requirements with which the parties agree to comply. The contracts recite that the drivers are independent contractors and not employees of Max Trucking. The contracts also recite that the drivers are responsible for obtaining their own workers compensation coverage, and that Max Trucking will not cover them. There is no evidence, however, that any driver actually obtained his or her own coverage, and the Court finds as a matter of fact that no driver obtained coverage for himself or herself.

*Id*. at *1.

When the dispatchers identify loads they believe Max Trucking drivers are available to transport and deliver, they contact drivers and offer the opportunity to take on these loads. The drivers may accept or decline the opportunity. On accepted loads, Max Trucking and the driver divide the amount paid for each individual job, with Max Trucking taking 10%–12% and the driver taking the remaining 88%–90%. In addition, all drivers on a haul have daily contact with dispatchers to report their status and location; this information is required by the brokers and is necessary to arrange shipments.

Kovacevic testified that the trucks used in its operations are registered with the U.S. Department of Transportation ("DOT") under Max Trucking. By virtue of this registration, all of

its drivers operate on the roadways under Max Trucking's DOT number, which is displayed on each truck along with Max Trucking's decals. Drivers must fill out a daily logbook, which Max Trucking uses to monitor the drivers' compliance with DOT regulations. While it would be possible for one of Max Trucking's drivers to use his truck to transport freight for another company, he would have to obtain a new logo and DOT number to display on his truck, and no longer would be able to drive for Max Trucking. In the past, only one driver under the lease-to-buy program has gone to work for another company while continuing to make payments on his lease, but he had to obtain new logos, DOT number and decals, and, thus, no longer could transport for Max Trucking.

Kovacevic ensures drivers' documents are up to date, their required daily logbooks are properly filled out and timely submitted, and that they are compliant with the law and applicable DOT regulations. Max Trucking does not provide training, but it provides an orientation for new drivers to review applicable laws and regulations.

Drivers must pay all expenses associated with transport out of their share of the proceeds. Max Trucking advances expenses for fuel by giving each driver a fuel card, and also advances costs of repair, liability insurance, and rental of the truck-trailers used to transport accepted loads; the driver, however, is always ultimately responsible for those expenses. Kovacevic testified that he acknowledged that these goods and services for which costs were advanced were necessary for the drivers to be able to do their jobs. He also acknowledged that Max Trucking receives its 10%–12% share of the fee paid regardless of the expenses the driver incurs. If expenses exceed the percentage the driver is paid for the job, the driver bears the loss. Max Trucking does not have a repair facility or a storage facility for the trucks used in its operations.

Liberty Mutual presented testimony from Russell Griffith, a Senior Forensic Consultant who had worked for Liberty Mutual as an insurance auditor for more than 35 years. He testified that in the past, he had performed audits of policies secured through the Michigan Facility, including a significant number of audits of similar trucking companies. Based on his audit of Max Trucking, he determined that the drivers leasing their vehicles from Max Trucking were employees, subject to coverage under the WDCA. He explained the Facility places "a lot of weight" on who owns the vehicle, and thus, his conclusion was strongly influenced by the fact

that the vehicles were registered to Max Trucking, and that Max Trucking technically could take the vehicles away and terminate the lease-to-buy agreement at any time.

Griffith calculated that the additional premium due for the drivers in question was $101,592. He arrived at this number pursuant to a sub-part of Rule Nine in the Facility's manual, which governs the determination of premiums for uninsured subcontractors with employees:

> Where contractors are for vehicles with drivers, the payroll shall be 1/3 of the total contract price. When the contract price does not include the cost of fuel, maintenance or other services provided, the value of such goods and services shall be added to the contract price before determining the 1/3 amount.

Thus, $101,592 is equal to the construed wages or worker's compensation premium basis of one-third of the total compensation reported on the 1099 forms for the drivers, adjusted by application of the worker's compensation rate for trucking in Michigan.

Mr. Westerhoff, Max Trucking's Certified Public Accountant, testified that the drivers operating under the lease-to-buy program were owners of the leased trucks, even though Max Trucking held title, because: (1) a lease with a purchase for a nominal fee at the end is a loan; (2) Max Trucking did not carry the leased trucks as assets on its financial statements, although the statements did list the lease receivables as assets; and (3) the drivers were able to claim depreciation for the leased trucks in their tax returns. Westerhoff testified that Griffith's standard for calculating the premium did not represent a fair assessment of the amount that the driver would make at the end of the day. He opined that 10.2% of Form 1099 compensation would be a more appropriate standard. He testified he had never worked for an insurance company offering worker's compensation insurance and had no training regarding workers compensation policies.

The district court concluded that the Michigan drivers at issue were employees, not independent contractors, for worker's compensation purposes. *Id*. at \*3. Under the definition of employee set forth in Mich. Comp. Laws 418.161(1)(l) and (n), as amended by 2011 P.A. 266, the district court applied the three-part test and determined it was undisputed that the drivers worked for hire for Max Trucking, and that: (1) none of the drivers at issue maintained a separate trucking business; (2) held himself out to the public as a trucking business; or (3) qualified as an

employer under the WCDC.  *Id*.  The district court also found that Max Trucking owed Liberty Mutual $101,592 in outstanding premiums.  *Id*. at *5.

## II.  DISCUSSION

The primary issue before this Court is whether the Michigan drivers working for Max Trucking who participated in the lease-to-buy program were "employees," and not "independent contractors" as defined by the applicable test codified at Mich. Comp. Laws § 418.161(1)(n). This determination requires an interpretation of 161(1)(n), as amended by 2011 P.A. 266, which defines "employee."  There is no settled case law interpreting the proper application of the amendatory language of 161(1)(n).  Appellant contends that the district court improperly relied on the unchanged three-part test in the first sentence of 161(1)(n) as the standard for determining employment status, when it should have relied only on the 20-factor Revenue Test set forth in the amendatory language of 161(1)(n) ("20-factor test" or "Revenue Test").

We hold that the district relied upon the proper test under the WDCA to determine the employment status of the drivers at issue.  Pursuant to that test, the district court properly held that the drivers are employees, and not independent contractors.  Finally, the district court did not err in adopting Defendant's calculation of the outstanding premium balance.

### A.  Test for determining employment-status under 161(1)(n)

#### 1.  Standard

"'A matter requiring statutory interpretation is a question of law requiring de novo review, and the starting point for interpretation is the language of the statute itself.'"  *United States v. Brown,* 639 F.3d 735, 737 (6th Cir. 2011) (quoting *United States v. Batti,* 631 F.3d 371, 375 (6th Cir. 2011)).

#### 2.  Analysis

Appellant's challenge to the district court's conclusion that the truckers are employees, and not independent contractors, requires an interpretation of 161(1)(n) which, in relevant part, reads as follows, with the amended portion in bold:

As used in this act, "employee" means:

* * *

(n) Every person performing service in the course of the trade, business, profession, or occupation of an employer at the time of the injury, if the person in relation to this service does not maintain a separate business, does not hold himself or herself out to and render service to the public, and is not an employer subject to this act. **On and after January 1, 2013, services are employment if the services are performed by an individual whom the Michigan administrative hearing system determines to be in an employer-employee relationship using the 20-factor test announced by the internal revenue service of the United States department of treasury in revenue ruling 87-41, 1 C.B. 296. An individual for whom an employer is required to withhold federal income tax is prima facie considered to perform service in employment under this act. If a business entity requests the Michigan administrative hearing system to determine whether 1 or more individuals performing service for the entity in this state are in covered employment, the Michigan administrative hearing system shall issue a determination of coverage of service performed by those individuals and any other individuals performing similar services under similar circumstances.**

Mich. Comp. Laws § 418.161(1)(n) (emphasis added).

In its analysis, the district court first explained the legal standard for defining "employee" under the WDCA. It began by noting that under subsections (1) and (n) of Mich. Comp. Laws § 418.161(1) "employee" is defined as:

(l) [e]very person in the service of another, under any contract of hire, express or implied[;] and

(n) Every person performing service in the course of the trade, business, profession, or occupation of an employer at the time of the injury, if the person in relation to this service does not maintain a separate business, does not hold him or herself out to and render service to the public, and is not an employer subject to this act.

*Max Trucking*, 2014 WL 3756129, at *3. The district court explained that a special panel of the Michigan Court of Appeals had recently ruled that all three statutory criteria in subsection (n) must be met in order for the individual to "avoid the 'employee' classification." *Id*. (citing *Auto-Owners Ins. Co. v. All Star Lawn Specialists Plus Inc.,* 845 N.W.2d 744 (Mich. Appl. Ct. 2013) (*overruling Amerisure Ins. Co. v. Time Auto Transp. Inc.,* 493 N.W.2d 482 (Mich. App. Ct. 1992)). Then the district court noted that subsection (n) of the statute states further that:

> [o]n and after January 1, 2013, services are employment if the services are performed by an individual whom the Michigan administrative hearing system determines to be in an employer-employee relationship using the 20–factor test announced by the internal revenue service of the United States department of treasury in revenue ruling 87–41.

*Id*. The district court concluded that the meaning of subsection (n) is that "if the Michigan administrative hearing system treats an individual as an employee for Internal Revenue Service purposes, he or she is automatically treated as an employee for WDCA purposes." *Id*.

Then, the district court applied the three-part test in the first sentence of 161(1)(n) and concluded that the drivers under the lease-to-buy program were employees because: "none of the drivers at issue maintains a separate trucking business; holds himself out to the public as a trucking business; or qualifies as an employer under the WDCA." *Id.*

Next, the district court addressed Max Trucking's assertion that under the 20-factor IRS test, to which the amendatory language in 161(n)(1) refers, the drivers are independent contractors, and thus they were independent contractors for the purposes of worker's compensation. The district court disagreed, holding:

> Even assuming the 20-part IRS test applies, it does not change the result in this case. First, the reference to the 20-part test simply creates an additional basis on which an individual may qualify as an employee for worker's compensation purposes. In other words, after the effective date of January 1, 2013, all individuals who are W-2 employees for IRS purposes are automatically workers compensation employees too. But that does not mean that anyone receiving a 1099 for tax purposes is not an employee for workers compensation purposes. The statute does not say that, and there are good reasons that the State may define "employee" for workers compensation purposes more broadly than the IRS does for W-2 purposes. Second, even under the 20-factor test, the factors weigh in favor of finding employee and not independent contractor status. The point of the three-part test, as well as the 20-part test, is to expose the economic reality of the working relationship and treat it accordingly. Here, the economic reality reflects that the drivers are employees of Max Trucking, for reasons already summarized.

*Id.* at *4.

Appellant argues that the district court's above holding shows that the court inappropriately applied both tests—the Revenue Test and the three-part test—to the drivers. Appellant contends that this was an error because, according to the amendatory language of

161(1)(n), after January 1, 2013, the district court was permitted to apply only the Revenue Test to determine the employment status of the drivers.

This Court is called upon to interpret this amended statute in the first instance. The Sixth Circuit has noted that, "[u]nder Michigan law, statutory interpretation requires an examination of the plain language of the statute." *Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014) (citing *In re Certified Question,* 468 Mich. 109, 659 N.W.2d 597 (2003), which held, "[a] fundamental principle of statutory construction is that a clear and unambiguous statute leaves no room for judicial construction or interpretation"). Although the district court did not engage in an explicit statutory interpretation of 161(1)(n), a plain reading of 161(1)(n) shows that the district court was correct to apply the three-part test to this case, and not to rely on the 20-factor test.

First, the language of the statute shows that the amendatory language providing that "[o]n and after January 1, 2013, services are employment if the services are performed by an individual whom the Michigan administrative hearing system determines to be in an employer-employee relationship using the 20-factor test," did not replace the test provided in the first sentence of subsection (n). Instead, the first sentence of subsection (n), which contains the three-part-test, was re-enacted and published without change or limitation by the amendatory legislative act. Thus, it is still good law.

As the Appellee notes, Article 4, Section 25, of the Michigan Constitution requires that when a legislative act is altered or amended, the sections that are altered or amended must be "re-enacted and published at length." Const. 1963, art. 4, § 25. Further, under Mich. Comp. Laws 8.3u:

> The provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments. If any provision of a law is repealed and in substance re-enacted, a reference in any other law to the repealed provision shall be deemed a reference to the re-enacted provision.

Mich. Comp. Laws § 8.3u. Although 161(n)(1) was amended in 2011, the first sentence of 161(n)(1) contains the same definition of employee in the current version as it contained prior to the 2011 amendment:

> Every person performing service in the course of the trade, business, profession, or occupation of an employer at the time of the injury, if the person in relation to this service does not maintain a separate business, does not hold himself or herself out to and render service to the public, and is not an employer subject to this act.

Accordingly, under Article 4, § 25 of the Michigan Constitution, and Mich. Comp. Laws 8.3u, this Court construes the first sentence as a continuation of the law.

Second, the amendatory language to 161(n)(1) did not add any new language that limits its application or effectiveness. As Appellee notes, the legislature could have amended the first sentence to read that it only would apply until January 1, 2013, with the amendatory language to be applied exclusively thereafter, but it did not do so.

Third, the face of the amendatory language limits use of the Revenue Test to determinations of employment status made in administrative proceedings before the Michigan Administrative Hearing System ("MAHS"). Since the determination of the employment status of the drivers in this case did not come to this Court by way of the MAHS, but rather by way of an insurance premium dispute, the language of the statute does not call upon us to apply the Revenue Test, and certainly does not call upon it to apply the Revenue Test exclusively. This truth is only bolstered by the amendment's legislative history. *See* Mich. Senate Fiscal Agency's Bill Analysis, H.B. 5002, 12/19/2011 (discussing the use of the three-part test in defining "employee" and the 20-factor test for MASH determinations of "employment" after January 1, 2013), and Mich. Dept. of Labor & Econ. Growth Bill Analysis, H.B. 5002, 12/14/2011 (stating that the purpose of the amendatory language at issue is to "[a]llow the Michigan Administrative Hearings System (MAHS) to determine whether an employee/employer relationship exists using the IRS 20-factor test, and provides an amnesty period of one year to promote compliance").

Thus, we find that the Revenue Test did not supplant the three-part test.

Appellant argues further that the district court's application of the three-part test, in addition to the Revenue Test, leads to the illogical result that the truckers may be "independent contractors" under the Revenue Test, and for tax purposes, but employees for worker's compensation insurance purposes. This is because the twenty-factor test is more detailed and exacting, and one can conceive of a situation in which a person is found to be an employee under

the broader three-part test, but an independent contractor under the 20-factor test. In its brief, Appellant applies all twenty factors to the facts of this case, and argues that such an application demonstrates that the drivers at issue are independent contractors.

First, contrary to Appellant's assertion, nothing in the district court's opinion indicates its holding depended upon an application of the three-part test in addition to an application of the Revenue Test. Instead, the district court held that the drivers were employees under the three-part test, and then considered the 20-factor test simply on an argumentative basis, stating: "Even assuming the 20-part IRS test applies, it does not change the result in this case." 2014 WL 3756129, at *4. Couched in argument, therefore, the district court found that 161(1)(n)'s "reference to the 20-part test simply creates an additional basis on which an individual may qualify as an employee for worker's compensation purposes." *Id.* This statement indicates nothing more than the district court's opinion that the Revenue Test is an independent basis for finding employee status.

Similarly, Appellant's argument is without merit that the district court erred in finding summarily that "even under the 20-factor test, the factors weigh in favor of finding employee and not independent contractor status." *Id.* First, as the district court reasoned, the purpose of the 20-factor test, like the three-part test, is to "expose the economic reality of the working relationship," which the Court had already found was one of employer-employee under the three-part test. *Id.* Second, as stated *supra*, the district court neither was bound to apply the 20-factor test, nor did it expressly apply the 20-factor test in anything but an argumentative fashion. Thus, we need not review whether the district court erred in its summary application of the 20-factor test.

The Appellant does raise a valid concern regarding which test under 161(1)(n) MAHS will use in future administrative proceedings to determine employment status. Appellant argues that it is conceivable that conflicts may arise between determinations of employment status MAHS may reach under the reenacted and broader three-part test, and determinations under the narrower, 20-factor test.

This issue, however, is not properly before this Court. As stated *supra*, the amendatory language limits use of the Revenue Test to determinations of employment status made in

administrative proceedings before MAHS, and this case did not come to this Court by way of the MAHS.

Nevertheless, this Court agrees with the district court's rationale that while under the amendatory language, an individual for whom an employer is required to withhold federal income tax under the 20-factor test is considered automatically to perform service in employment, the reverse is not true under the 161(1)(n). In other words, while under the amendatory language issuance of a W-2 is *prima facie* evidence of employee status, issuance of a 1099 is not *prima facie* evidence of independent contractor status under 161(1)(n). Thus, under the language of 161(1)(n), a finding of independent contractor status under the Revenue Test does not necessarily bar a finding that those services are employee services under the surviving three-part test in the first sentence of 161(1)(n). The amendatory language nowhere states that the 20-factor test is the only test to be used to determine employment status. Instead, it states merely that services will be considered employment if an employer-employee relationship is found under the 20-factor test.

Thus, the district court applied the proper standard for determining employment status under 161(1)(n). It did not err by relying on the three-part test in the first sentence 161(1)(n) for the definition of "employee", and not relying on the Revenue Test in the amendatory language of 161(1)(n).

### B. Whether the district court properly determined the drivers at issue are employees under the WDCA

#### 1. Standard of Review

Whether a particular situation is an employment relationship is a question of law. *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 521-22 (6th Cir. 2011) (quoting *Fegley v. Higgins,* 19 F.3d 1126, 1132 (6th Cir. 1994)). We review the district court's factual findings made after a bench trial for clear error, "but review de novo the district court's application of the legal standard to them." *Id*. at 522. The parties do not dispute the district court's factual findings, but only its application of the law to the facts.

*2. Analysis*

The Michigan Supreme Court has explained that whether a person is an employee or an independent contractor for the purposes of the WDCA is determined by applying a two-step test. *Elde*, 2013 WL 2420970, at *4 (citing *Reed v. Yackell,* 473 Mich. 520, 530; 703 NW2d 1 (2005) (Taylor, C.J., Young and Markman, JJ., concurring)).  First, the Court must determine whether the person satisfies 161(1)(l).  *Id.*  Second, the Court must determine whether the person satisfies 161(1)(n).  *Id.*  As the district court in this case noted, there is no argument that the truck drivers do not satisfy 161(1)(l), as they were under contracts for hire.

The proper interpretation of the three-part test laid out in the first sentence of 161(1)(n) has changed since the district court applied the test.  Since 1992, Michigan Courts have interpreted the three-part test to mean that all three criteria of 161(1)(n) must be satisfied in order to obtain employee status under the WDCA.  *See Amerisure Ins. Co. v. Time Auto Transp. Inc.*, 493 N.W.2d 482 (Mich. Ct. App. 1992).  Recently, in *Auto-Owners Ins. v. All Star Lawn Specialists Plus, Inc.,* a special panel overturned *Amerisure* and held that "all three of the criteria in Mich. Comp. Laws 418.161(1)(n) must be met before an individual is *divested of employee status.*" 845 N.W.2d 744 (Mich. Ct. App. 2013).  The district court in this case relied on the special panel's interpretation of the three-part test when determining the drivers' employment status.

Then, after the district court's decision, the Michigan Supreme Court overruled the special panel and concluded that *Amerisure* was properly decided, holding:

> Each criterion of MCL 418.161(1)(n) must be satisfied for an individual to be considered an employee; conversely, failure to satisfy any one of the three criteria will *exclude* an individual from employee status.

*Auto-Owners Ins. Co. v. All Star Lawn Specialists Plus, Inc.*, 857 N.W.2d 520, 523 (Mich. 2014). Thus, in order to be deemed an employee under 116(1)(n), a person must show that he or she: (1) does not maintain a separate business; (2) does not hold himself or herself out to render services to the public; and (3) is not an employer subject to the WDCA.

The Michigan Supreme Court's overruling of the special panel in *Auto-Owners* does not affect the district court's ruling in this case because the district court found that every criterion

was met: "[T]he Court finds that none of the drivers at issue maintains a separate trucking business; holds himself out to the public as a trucking business; or qualifies as an employer under the WDCA." 2014 WL 3756129, at *3. We agree with the district court.

First, the district court found, and the parties do not dispute, that none of Michigan drivers at issue has any employees. Second, the district court properly found that none of the drivers maintains a separate trucking business, and, similarly, that none of the drivers holds himself out to the public as a trucking business. While the district court did not distinguish clearly which facts supported which criterion, the district court's findings can be disaggregated to meet each criterion.

The district court's finding that none of the truckers holds himself out to the public as a trucking business is supported by the finding that while it may be true, theoretically, that the drivers are free to drive for other companies if they desire, it is not what happens in fact. Instead, "the evidence reflects that only one driver has actually done so, and that driver ceased working for Max Trucking at that point. All of the other drivers drive for Max Trucking alone, and the drivers receive all of their dispatches from Max Trucking." *Id*. at *4. Indeed, the record shows that the drivers can operate only for Max Trucking on the roadways, using Max Trucking's DOT number exclusively.

In support of the finding that none of the drivers at issue maintains a separate trucking business, the district court found that the drivers were financially dependent on Max Trucking for all practical purposes:

> The trucks at issue are all registered in Max Trucking's name. Max Trucking provides liability and physical damage insurance coverage and advances fuel and repair payments to the drivers, eventually charging costs back to the drivers. The drivers have the means necessary to perform the services for Max Trucking only because Max Trucking provides these things up front, even if the costs are ultimately charged back to the drivers.

*Id*. at *3. The district court also distinguished the lease-to-buy drivers' complete dependence on Max Trucking from the owner-operator drivers' comparatively lower dependence on Max Trucking:

> Most importantly, Mr. Kovacevic, [Max Trucking's] General Manager, testified that the drivers at issue get their trucks only on the strength of Max Trucking's credit. Max Trucking's expert witness, Mr. Westerhof, testified similarly that the drivers lack a credit or asset base sufficient to obtain their trucks independently. They need the balance sheet of Max Trucking to acquire a truck.

*Id.*

As the district court explained in its findings of fact, the drivers operating under the lease-to-buy program "are effectively economically dependent on Max Trucking for their ability to operate as truckers." *Id.* at *2. This complete dependence indicates that the lease-to-buy drivers cannot be considered to maintain separate businesses.

*Elde v. Castles Bros. Inc.* supports upholding the district court's determination that the drivers at issue are employees for the purposes of the WDCA. 2013 WL 2420970, at *1 (Mich. Ct. App. June 4, 2013) *appeal denied sub nom. Elde v. Castles Bros., Inc.*, 838 N.W.2d 879 (Mich. 2013). In *Elde*, the defendant insisted that the plaintiff was an independent contractor because he was self-employed through his sole proprietorship (Bob Elde, Builder), obtained commercial insurance, and claimed his income by filing 1099 income-tax forms. *Id.* at *4. Although the defendant did not require the plaintiff to work a set number of hours, or guarantee plaintiff a minimum number of hours, plaintiff usually worked a forty-hour workweek for the defendant. *Id.* at *1. Thus, for 18 years, the plaintiff had received almost all of his personal income from the defendant. *Id.* The evidence showed that the plaintiff filed 1099s only because that was defendant's demand. *Id.* at *4. The *Elde* Court found, therefore, that while evidence such as filing a 1099 was relevant, it did not negate competent evidence that the plaintiff did not maintain a separate business offering the same services to others that he offered on behalf of the defendant. *Id.*

Further, the *Elde* Court found that the plaintiff did not hold himself out to render construction services to the public: the plaintiff had no business cards; he did not advertise; and, outside of performing an occasional miscellaneous job for friends or family, he only performed work that the defendant offered to him. *Id.* at *5.

Like the Court in *Elde*, this Court finds that while the contract recites that the drivers are independent contractors, and the drivers are required to file 1099s, such evidence does not negate

competent evidence that the drivers do not maintain separate businesses offering trucking services to businesses other than Max Trucking. *See also, e.g., State Auto Prop. & Cas. Ins. v. A–3, Inc.,* No. 276535, 2008 WL 4367464, at *3 (Mich. Ct. App. Sept. 25, 2008) (even where a contract states that a person is an independent contractor and not an employee, the language of 161(1)(n) "does not confine the examination of employee status strictly to the parties' contractual language, if there is a contract."). Further, like in *Elde*, although the drivers are not required to accept a load or work a set number of hours, the reality is that they receive all of their personal income from Max Trucking, and would not be able to provide trucking services to Max Trucking but for access to the lease-to-buy program.

Moreover, as in *Elde*, the truckers at issue do not hold themselves out to render services to the public: they do not and cannot provide services to anyone other than Max Trucking, and they do not advertise their services. *Cf. Moore v. Nolff's Const.*, No. 313440, 2015 WL 493318, at *5 (Mich. Ct. App. Feb. 6, 2015) (finding that if the worker provides the same services to someone else that it does to the alleged employer, the worker cannot show that he does not maintain a separate business).

Appellant does not challenge the district court's application of the three-part test in the first sentence of 161(1)(n). Instead, the Appellant argues more broadly that the district court erred when it concluded that the economic reality of the relationship between Max Trucking and the drivers in question is that of employer and employee. Appellant goes through each of the 20-factors in the Revenue Test, and contends that an application of that test proves that the economic reality is one of employer and independent contractor. Specifically, Appellant attacks the district court's reliance on *Peno Trucking, Inc. v. C.I.R.,* 296 F. App'x 449 (6th Cir. 2008), a tax court case that found the truckers at issue were employees, not independent contractors, based on the economic reality of the employment relationship. Appellant argues that *Peno* is distinguishable because in that case the drivers did not assume costs, bear risk of loss, or own trucks. Appellant urges the Court to rely, instead, on *Nichols v. All Points Transp. Corp. of Michigan*, which found that the truckers at issue were independent contractors under the "economic realities" test employed under the Family Medical Leave Act ("FMLA"). 364 F. Supp. 2d 621, 630 (E.D. Mich. 2005). Appellant contends that the drivers in *Nichols* had an

employment relationship with their trucking company that is similar to the employment relationship the disputed drivers have with Max Trucking.

This Court need not address Appellant's arguments related to *Peno* and *Nichols*. *Peno* considered the standard for determining employment status for federal tax purposes, and *Nichols* considered the standard for determining employment status for FMLA purposes. As explained in *Cent. States, Se. & Sw. Areas Pension Fund v. Int'l Comfort Prod. LLC*, when a court is tasked with determining whether a worker is an employee or independent contractor for the purposes of a particular statute, the Court cannot rely on cases that determined employment status under statutes different than the one at issue. No. 3:07-CV-00383, 2011 WL 3608553, at *9 (M.D. Tenn. Aug. 16, 2011) (holding that reliance on cases addressing employer-employee relationships under various areas of federal law, including ERISA, federal tax law, and Title VII law, was improper where the question before the court was whether an employer-employee relationship existed under the Multiemployer Pension Plan Amendments Act, 29 U.S.C. § 1381 *et seq.*). Similarly, in *Nichols*, the Court explained that "[t]he FLSA's definition of employee is broader than the common law definitions used by other statutory schemes, such as Title VII or the ADEA." 364 F. Supp. 2d at 630. As such, in its analysis, the *Nichols* Court did not rely on cases applying the Title VII or ADEA test for determining employment status. Accordingly, it is improper to rely on the rationale in either *Peno* or *Nichols* in this case for determining if the drivers are employees or independent contractors under the WDCA, as those cases did not apply the standard under the WDCA.

Reliance on the "economic reality" test used in *Peno* and *Nichols* is inappropriate for another reason. In 1985, the Michigan Legislature amended the definition of employee in the WDCA by adding the current three-part test to the first sentence of 161(1)(n). *See Hoste v. Shanty Creek Mgmt., Inc.*, 592 N.W.2d 360, 364-65 (Mich. 1999). Prior to that, the WDCA defined "employee" only as a person under a contract for hire, and the Michigan courts applied an eight-part economic realities test to determine employment status.[1] *Id*. at 571. In interpreting

---

[1]The factors of the "economic reality" test under the WDCA, prior to the 1985 Amendment, were:

First, what liability, if any, does the employer incur in the event of the termination of the relationship at will?; Second, is the work being performed an integral part of the employer's business which contributes to the accomplishment of a common objective?; Third, is the position

the 1985 amendment, the Michigan Supreme Court held that the three-part-test superseded the common law "economic realities" test previously employed. *Id*. at 572. It further held that while the three-part test incorporated some of the eight "economic-reality" factors, it had not incorporated all of the factors; thus, the old case law regarding the "economic realities test" only could be applied to those factors that had been preserved in the new three-part test. *Id*. Accordingly, any application of an economic realities test is inappropriate in this case.

It should be noted that the district court's reference to *Peno* and the economic reality test presents no hurdle to upholding the district court's ruling. As delineated, *supra*, the district court performed a full application of the three-part test, and came to a well-reasoned conclusion that the drivers are employees. *Peno* provided merely non-dispositive support to the district court's holding.

Appellant also argues that in concluding that the drivers were employees, the district court failed to acknowledge that: (1) the operators may decline to work; (2) they can incur a financial loss; (3) they made a significant financial investment in the vehicle purchase; and (3) they receive all tax deductions and depreciation of the vehicles on their personal tax returns. While these considerations may be more relevant under the 20-factor test, they are less persuasive under the three-part test. As noted in *Elde*, while certain factors indicating independent contractor status may be relevant, the Court is permitted to rely on competent evidence to the contrary that shows the drivers in question do not maintain separate businesses, and do not hold themselves out to render services to the public.

Finally, the Appellant objects to the district court's finding that "Mr. Kovacevic, Plaintiff's General Manager, testified that Max Trucking has attempted to structure its relationship with the drivers as an independent contractor relationship precisely to avoid having

---

or job of such a nature that the employee primarily depends upon the emolument for payment of his living expense?; Fourth, does the employee furnish his own equipment and materials?; Fifth, does the individual seeking employment hold himself out to the public as one ready and able to perform tasks of a given nature?; Sixth, is the work or the undertaking in question customarily performed by an individual as an independent contractor?; Seventh, control, although abandoned as an exclusive criterion upon which the relationship can be determined, is a factor to be considered along with payment of wages, maintenance of discipline and the right to engage or discharge employees.; Eighth, weight should be given to those factors which will most favorably effectuate the objectives of the statute. [*Id*. at 208–209, 201 N.W.2d 333.].

*Hoste*, 592 N.W.2d at 363.

to provide workers compensation coverage to the drivers." 2014 WL 3756129, at *4. Appellant argues that it did not develop the lease-to-buy program in 2008 to avoid the worker's compensation system, but, instead, developed the program in response to the 2008 economic downturn. Further, Appellant clarifies that Max Trucking moved over to the owner-operator structure in 2006, in response to a bad worker's compensation experience with an employee-driver. This objection is unfounded. The district court referred broadly to Max Trucking's attempt to structure its business in order to avoid worker's compensation liability. Both eliminating any employee-truckers in 2006, and also instituting a buy-to-lease program in 2008, contributed to a business model that avoids worker's compensation responsibilities.

Accordingly, this Court AFFIRMS the district court's finding that the drivers are employees under the applicable test.

### C. Damages-premium calculation

#### 1. Standard of Review

"In a non-jury action a trial court's determination of damages is reviewable only for abuse of discretion, subject to being set aside as a finding of fact under the 'clearly erroneous' standard of Rule 52(a) of the Federal Rules of Civil Procedure." *Smith v. Manausa*, 535 F.2d 353, 354 (6th Cir. 1976). Clear error will be found only when the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985).

#### 2. Analysis

Appellant challenges the district court's adoption of Liberty Mutual's calculation of the outstanding worker's compensation insurance premium owed to it for the disputed drivers.

At trial, Griffith calculated that the premium due for the drivers was $101,592. He arrived at this number pursuant to the following standard in the Michigan Worker's Compensation Placement Facility Basic Manual for Worker's Compensation and Employers' Liability Insurance ("Facility's Manual"):

Rule Nine-Special Condition or Operations Affecting Coverage and Premium

F. Subcontractors

3. Premium for Uninsured Subcontractors with Employees

Exceptions

(3) Where contractors are for vehicles with drivers, the payroll shall be 1/3 of the total contract price. When the contract price does not include the cost of fuel, maintenance or other services provided, the value of such goods and services shall be added to the contract price before determining the 1/3 amount.

Thus, according to Liberty Mutual, $101,592 is equal to the construed wages or "workers compensation premium basis" of one-third of the total compensation reported on the 1099 forms for the drivers, adjusted by application of the workers compensation rate for trucking in Michigan.

Mr. Westerhoff, Max Trucking's Certified Public Accountant, testified that Griffith's standard for calculating the premium did not represent a fair assessment of the amount that the driver would make "at the end of the day." He opined that 10.2% of Form 1099 compensation would be a more appropriate standard. Westerhoff testified he had never worked for an insurance company offering worker's compensation insurance, and had no training regarding worker's compensation policies. Finally, he testified that while he estimated actual wages averaged 10.2% of the 1099 form, he could not verify that number, nor testify as to a precise rate of return for any of the drivers at issue.

Accordingly, the district court found, by a preponderance of the evidence, that Liberty Mutual's calculations were correct:

First, the only evidence from anyone who actually works in the workers compensation insurance business weighs in favor of Liberty Mutual. The testimony is unrebutted that the one-third rule of thumb applies in translating gross revenues on the 1099s to wage base for workers compensation purposes. Second, Max Trucking's arguments to the contrary rest on the testimony of a CPA who is not a workers compensation expert and who has not even reviewed the coverage manual. Finally, the risk of uncertainty fairly falls on Max Trucking. It is in the best position to treat the truckers as employees, and to document "wages," as well as other business expenses. But it has not done so either contemporaneously, or even for purposes of this case. Accordingly, the Court credits Liberty Mutual's evidence on damages and finds that Liberty is entitled to $101,592 in damages for unpaid premiums due.

*Max Trucking*, 2014 WL 3756129, at *5.

Appellant contends, first, that the district court's holding was in error because Mr. Griffith relied on a manual provision that applied only to uninsured subcontractors with employees, which most of the drivers at issue are not.  Second, Appellant argues that the policy manual upon which Liberty Mutual and the district court relied is not in the contract, and nothing in the contract would place Max Trucking on notice to treat the drivers as employees, document wages, or anticipate paying worker's compensation premiums based on sums advanced for fuel, insurance, repairs, and fees.

Appellant's objections are not well taken. Mr. Griffith's determination was based on his application of the Facility's Manual to the facts at hand.  As a participating member of the Facility, Liberty Mutual was bound by Michigan law to apply the Facility's classification and rating systems contained in the Manual:

> Sec. 2318. (1) The classification and rating systems of the facility shall be determined by the designated advisory organization, subject to the requirements of this chapter and the approval of the commissioner.
>
> (2) Every participating member designated to act on behalf of the facility shall be authorized to use the classification and rating systems of the facility on business placed through the facility and shall not use other rates for worker's compensation insurance placed through the facility.

Mich. Comp. Laws § 500.2318. Thus, Appellant's argument that such standards were not contained in the contract, and thus it was not on notice of its responsibilities, is unavailing.

Further, Griffith testified that based on his 35 years of experience, and prior experience auditing truck companies, he used the correct standard from the Manual to calculate the premium.  Even assuming the standard upon which Griffith relied is not perfectly applicable to the circumstances of the drivers at issues—as all but three are not subcontractors, but work directly for Max Trucking—his reliance on the standard was not in error under the WDCA.

As Rule (9)(F)(3)(3) articulates, the premium for hired drivers depends on a calculation of payroll wages, including fuel and other services, with one-third of the 1099 Form serving as an estimate for payroll wages.  Under the WDCA, the average payroll wages must be calculated for the purposes of worker's compensation payments because the payroll wages are used to

determine the proper premium to charge employers.  In cases like this one, however, where the "hourly earnings of the employee cannot be ascertained," the wage of the employee shall be "taken to be the usual wage for similar services if the services are rendered by paid employees." Mich. Comp. Laws § 418.371.

Since the hourly earnings and/or yearly wages of the drivers at issue cannot be ascertained due to Max Trucking's failure to keep accurate records, § 418.371 can be applied to determine the drivers' wages, and, thus, the correct premium.  As Appellant concedes, the standard Griffith used to calculate the premium undoubtedly applies to the three drivers under the lease-to-buy program who were subcontracting an employee to drive for them.  Further, the parties cannot contest that there is no appreciable difference between the services the subcontractor drivers provide under the lease-to-buy program, and the services the drivers who lease directly from Max Trucking provide.  Thus, under § 418.317, Griffith was permitted to rely on the one-third standard (which includes fuel and maintenance costs), which undoubtedly applies to the subcontracted drivers, in order to determine the wages of the drivers working directly for Max Trucking.  Thus, the district court properly adopted the standard that Griffith used to determine the premium.

In addition, findings of fact, such as the determination of damages, are reviewed on appeal for clear error.  Fed. R. Civ. P. 52(a).  Clear error will be found only when the reviewing court is left with the definite and firm conviction that a mistake has been committed.  *Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985).  Even greater deference is required when the findings of fact rest upon credibility determinations.  *Id.* at 575.  Where there are two permissible views of the evidence, the factfinder's choice between them is not clearly erroneous.  *Id.* at 574.

In this case, the district court determined it would not credit Max Trucking's CPA's calculations over Liberty Mutual's auditor's calculations.  In support, the trial court found that Liberty Mutual's witness was the only one who worked in the worker's compensation insurance business and relied on the Facility's Manual, and that Max Trucking's CPA's calculations were not based on reliable evidence.  *See, e.g., United States v. Garavaglia*, 178 F.3d 1297 (6th Cir. 1999) (table opinion) (finding restitution in the amount calculated by the Government was

correct because the Government provided a credible report regarding the loss to insurance companies, and the defendant did nothing more than attack the Government's report); *Summit Petroleum Corp. of Indiana v. Ingersoll-Rand Fin. Corp.*, 909 F.2d 862, 868 (6th Cir. 1990) (finding the district court did not err in calculating a damages because "[g]iving appropriate regard 'to the opportunity of the trial court' to assess 'the credibility of the witnesses[,]' *see* Fed. R. Civ. P. 52(a), we cannot say that the district court's established value of $275,000 is clearly erroneous").

For the above-stated reasons, the Court AFFIRMS the district court's findings concerning the premium owed to Liberty Mutual.

### III.  CONCLUSION

Appellant has failed to show that the district court erred in any of its determinations on appeal.  For the above-stated reasons, the Court AFFIRMS the decision of the district court.